## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARC STONE, | : Civil No. 1:24-CV-821 |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : (Chief Magistrate Judge Bloom) |
| FRANK BISIGNANO, | : |
| Commissioner of Social Security,[1] | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I.  Introduction

Marc Stone filed an application under Titles II and XVI of the Social Security Act for disability and disability insurance benefits, as well as supplemental security income, on August 12, 2021.  Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Stone was not disabled from his alleged onset date of April 13, 2021, through April 18, 2023, the date of the ALJ's decision.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Bisignano is substituted as the defendant in this suit.

Stone now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supports the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.  <u>Statement of Facts and of the Case</u>

Marc Stone filed for disability and disability insurance benefits, as well as supplemental security income, alleging disability due to a myocardial infarction, congestive heart failure, ischemic cardiomyopathy, major depressive disorder, anxiety, agoraphobia, renal transplant, high immunosuppression, stage 3B renal disease, gout, and neuropathy. (Tr. 63). Stone was 35 years old at the time of his alleged onset of disability, had at least a high school education, and had past relevant work as a credentialing specialist and a night auditor. (Tr. 34-35).

The medical record regarding Stone's impairments revealed that Stone presented to the emergency room at UPMC West Shore Hospital in April of 2021 complaining of chest pain. (Tr. 426). Stone was found to have frequent premature ventricular contractions ("PVCs"), and an EKG showed a wide complex tachycardia. (*Id.*). It was noted that Stone had a renal transplant as a child. (*Id.*). Stone was diagnosed with non-ST elevated myocardial infarction. (Tr. 430). He was discharged after a six-day hospital stay, during which time he had a successful balloon angioplasty and stent placement and was also treated for possible pneumonia. (Tr. 435).

At a follow up appointment with nephrology at Penn State Hershey Medical Center in April of 2021, it was noted that Stone's creatinine had improved during his hospitalization. (Tr. 633). Stone was noted to be on leave from work as a hotel clerk due to the recent hospitalization. (*Id.*). On exam, Stone was noted to be obese, with a BMI of over 40, alert and oriented, and had fluent speech, regular heart rate and rhythm, and no lower extremity edema. (Tr. 633-34). A note from Stone's primary care

provider indicated that Stone would be scheduled for cardiac rehabilitation. (Tr. 747).

In May of 2021, Stone treated with Dr. Tanya Wozniak, M.D., at Penn State's Behavioral Health Department. (Tr. 742). He reported that his depression was "through the roof" after his myocardial infarction two weeks prior, and that he had suicidal ideation two times per week. (Tr. 744). A mental status examination revealed a well-groomed and clean appearance, clear and fluent speech, intact memory, a sad mood, and intact insight and judgment. (*Id.*). Dr. Wozniak increased some of his medications and recommended he start therapy with an outside provider. (Tr. 745). Around this time, Stone followed up with UPMC's cardiovascular office, at which time it was noted he had "moderate LV systolic dysfunction with an EF of 35-40%." (Tr. 676). He reported no lightheadedness, dizziness, or syncope. (*Id.*). Stone's physical examination at this visit was largely unremarkable. (Tr. 679). The provider noted that Stone exhibited mild exertional dyspnea, a symptom that was "likely in the setting of being overweight, deconditioned and having moderate LV systolic dysfunction." (*Id.*).

4

In July, Stone reported that he was doing better since starting therapy, and his depression symptoms were still present but noticeably less. (Tr. 741). He further reported experiencing suicidal ideation twice per week. (*Id.*). Stone's mental status examination was unremarkable, with a notation of a "sad (but improving)" mood. (*Id.*). Dr. Wozniak noted that Stone had improved but still had significant symptoms. (Tr. 742). Around this time, Stone treated with the Orthopedic Institute of Pennsylvania ("OIP") for left foot pain, at which time he was diagnosed with left big toe gout. (Tr. 522). On examination, he walked with a cane and an antalgic gait but was noted to be "grossly well balanced and coordinated." (*Id.*). The provider noted some erythema and edema in the left big toe but no significant tenderness through the midfoot or to the ankle. (*Id.*). Stone received a steroid injection. (Tr. 522-23).

Stone went to a nephrology follow up in August of 2021, where it was noted he had recently be diagnosed with gout. (Tr. 641-42). At this visit, Stone reported ongoing pain in his left toe and mild discomfort in his right toe but no lower extremity edema. (*Id.*). A physical examination was unremarkable. (Tr. 642). A follow-up note indicated that Stone's

5

provider prescribed a prednisone taper for a gout flareup after he visited an urgent care. (Tr. 643, 651). Stone also treated with his primary care provider around this time, complaining of knee pain. (Tr. 738-39). His provider ordered an x-ray and prescribed a knee brace. (Tr. 739). A physical examination revealed normal tone and motor strength, a normal and steady gait, grossly intact sensation, and no edema, although it was noted that his left knee was sensitive to touch, and he exhibited tenderness and limited range of motion. (Tr. 738).

In October of 2021, Stone reported to Dr. Wozniak that he was "doing ok but was a little rough." (Tr. 734). He stated that his gout was better controlled but that he was still out of work and was unable to finish cardiac rehab due to his gout. (*Id*.). Stone further reported that his mental health was "average," noting that he was worried about finances and his ability to return to work. (*Id*.). A mental status examination revealed a stressed and anxious mood but otherwise unremarkable findings. (*Id*.).

Stone followed up with the UPMC cardiovascular office in November of 2021, at which time it was noted that Stone denied chest

pain but reported occasional transient lightheadedness and increased discomfort related to his gout. (Tr. 779). A physical examination was unremarkable other than a notation of mild swelling in his right big toe. (Tr. 783). The provider opined that Stone should be on a diuretic for his moderate LV systolic dysfunction. (Tr. 784). Stone underwent a Holter Patch Study in January of 2022 related to his complaints of dizziness and history of ischemic cardiomyopathy. (Tr. 806). The study revealed a normal sinus baseline rhythm with rare PVCs and PACs, no sustained arrhythmias and no significant bradycardia, and one symptom event associated with sinus rhythm. (*Id.*).

Stone underwent a mental status evaluation with Dr. John Kajic, Psy.D., in February of 2022. (Tr. 809-16). Stone reported difficulty sleeping, concentration difficulties, loss of energy, excessive worry, and phobic responses around crowds and enclosed spaces. (Tr. 810). He further reported an ability to perform personal care depending on his level of pain, do light household chores with help from roommates, and play videogames. (Tr. 812). A mental status examination revealed an appropriate appearance, fluent speech, coherent and goal directed

7

thought processes, a "down" mood, intact attention and concentration, and mildly impaired memory skills. (Tr. 811-12). Dr. Kajic opined that Stone had moderate limitations in understanding, remembering, and applying complex instructions, marked limitations in interacting with others, and unspecific concentration limitations. (Tr. 814-16).

Stone also underwent an internal medicine examination with Dr. Ahmed Kneifati, M.D., at this time. (Tr. 823-33). Stone reported his medical history, including his heart attack, congestive heart failure, gout, and kidney disease. (Tr. 823). Stone stated that he cooked a few times per week, showered almost daily, and watched television. (Tr. 824). On examination, Stone had a widened gait with short steps, could not walk on his heels and toes, walked with a cane, and was limited to 40% squat, although he had no difficulty getting on and off the examination table or with rising from a chair. (Tr. 825). Stone further exhibited no evident joint deformity, no tenderness or effusion, and 5/5 strength in his upper and lower extremities. (Tr. 826). Dr. Kneifati opined that Stone could lift and carry up to ten pounds; could sit for six hours, stand for three hours, and walk for two hours in an 8-hour workday; required a cane to

8

ambulate; and could never climb ladders, ropes, or scaffolds. (Tr. 828-33).

In March and May of 2022, Stone reported worsening depression and the continued presence of suicidal thoughts. (Tr. 856, 867). At these visits, mental status examinations revealed a sad or apathetic mood and suicidal ideation but were otherwise unremarkable, noting intact memory, intact insight and judgment, unremarkable though content, and fluent and clear speech. (*Id.*). In June, Dr. Wozniak noted Stone's depression was "currently bad[,]" and he exhibited poor self-care and avoidance. (Tr. 1010). His mood was apathetic, but he expressed improvement in his suicidal ideation. (Tr. 1011). A mental status examination was otherwise unremarkable. (*Id.*). Similarly, in July, Dr. Wozniak recorded that Stone's functioning was poor, but he was not experiencing any medication side effects. (Tr. 1004). At a visit in October, Stone reported decreased suicidal ideation, less severe mood swings, and that things were "ok[.]" (Tr. 992). Dr. Wozniak noted that Stone recognized his activities of daily living needed to improve. (*Id.*).

Around this time, Stone followed up with his primary care provider, complaining of intermittent thigh pain radiating to his shin. (Tr. 998). He reported no recent gout flares and denied headaches and chest pain. (*Id.*). His provider ordered an x-ray and placed a referral for physical therapy. (Tr. 999). In January of 2023, Stone went to the emergency room for a gout flareup. (Tr. 940). He complained of pain in his big toes, more severe on the left, as well as intermittent thigh pain. (*Id.*). Stone declined pain medication and advised he would use Tylenol and follow up with his primary care doctor. (Tr. 945). Around this time, Stone reported to Dr. Wozniak that he was still struggling with his activities of daily living and difficulties with interpersonal relationships. (Tr. 983). A mental status examination revealed some dysphoria and "some thoughts" of suicidal ideation but was otherwise unremarkable. (Tr. 987).

It is against the backdrop of this record that an ALJ held a hearing on Stone's disability application on March 16, 2023. (Tr. 43-62). Stone and a Vocational Expert both appeared and testified at this hearing. (*Id.*). Following this hearing, on April 18, 2023, the ALJ issued a decision denying Stone's application for disability benefits. (Tr. 14-42). The ALJ

first concluded that Stone had not engaged in substantial gainful activity since his alleged onset date of April 13, 2021. (Tr. 20). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Stone's suffered from the following severe impairments: obesity, congestive heart failure, cardiomyopathy, post kidney transplant (childhood), chronic kidney disease, gout, depression, and anxiety. (*Id.*). At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (*Id.*). Specifically, the ALJ noted that while there was no listing for obesity, there was no indication from the record that Stone's obesity increased the severity of his impairments such that it met or medically equaled a listing. (*Id.*).

Between Steps 3 and 4, the ALJ then concluded that Stone:

[H]a[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he requires a sit/stand option defined as stand/walk limitations of 4 hours per 8-hour workday; he can occasionally balance; he can never climb ladders, ropes, or scaffolds; he must avoid exposure to extreme cold, extreme heat, and humidity; he can understand and carry out simple, routine, repetitive tasks while maintaining regular attendance and being punctual within customary limits in a work environment free from fast paced production involving only simple work-related decisions

with few, if any, work place changes, no interaction with the
public, occasional interaction with coworkers but no tandem
tasks, and occasional supervision.

(Tr. 24).

In reaching this RFC determination, the ALJ considered the
objective medical record detailed above, the medical opinion evidence,
and Stone's reported symptoms. With respect to the medical opinion
evidence concerning Stone's mental health impairments, the ALJ
considered the opinions of the state agency consultants, Dr. Gavazzi and
Dr. Fink, and found these opinions persuasive. (Tr. 33-34). Dr. Gavazzi
opined in March of 2022 that Stone experienced mild to moderate
limitations in the four areas of social functioning, and that he could
perform one-to-two-step tasks in a stable environment. (Tr. 67, 72-73).
On reconsideration in July of 2022, Dr. Fink similarly opined that Stone
was mild to moderately limited in the areas of social functioning and
could perform simple and routine tasks. (Tr. 94, 98-99). The ALJ
reasoned that these opinions were "fairly consistent with one another"
and supported by the objective clinical evidence. (Tr. 33-34). The ALJ
also considered Dr. Kajic's February 2022 evaluation and opinion and

found it partially persuasive, noting that the marked limitation assessed in interacting with others was not supported by the clinical records.  (Tr. 34).

With regard to Stone's physical impairments, the ALJ considered the opinions of state agency consultants Dr. Bilynsky and Dr. Hollick and found these opinions persuasive.  (Tr. 32).  These March and August of 2022 opinions, respectively, both limited Stone to a range of light work, occasional postural limitations, and never climbing ladders, ropes, and scaffolds.  (Tr. 69-72, 95-98).  The ALJ found that these opinions where generally consistent with one another and supported by the objective clinical evidence.  (Tr. 32).  The ALJ also considered Dr. Kneifati's February 2022 assessment and found this opinion not persuasive, reasoning that Dr. Kneifati's more restrictive limitations were not supported by his own examination findings or consistent with any other assessment in the record.  (Tr. 33).

With respect to Stone's symptoms, the ALJ found that Stone's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence.

13

(Tr. 28).  Stone testified that he was able to dress himself daily and make very simple meals, but that he did not always shower daily because of his lower extremity pain and mental health impairments.  (Tr. 47).  He reported that he got his groceries delivered and relied on roommates for transportation after his heart attack.  (Tr. 48).  He could do a limited amount of household cleaning but got tired after about five minutes. (*Id.*).  Stone testified that a typical day for him included socializing with his roommates and online friends, staying in touch with a long distance boyfriend, and napping several times per day.  (Tr. 49).  He reported playing videogames with friends roughly five days per week for two hours at a time.  (Tr. 54-55).  With respect to his physical abilities, Stone testified that he could only walk about 500 feet before his knee hurt and he was out of breath, and he could stand in one place for about 20 minutes.  (Tr. 50).  He believed he would have trouble maintaining attendance at a job because of his gout flareups.  (Tr. 51).  He further reported that he was on multiple mental health medications but experienced suicidal thoughts several times per week.  (Tr. 52).

The ALJ ultimately found Stone's testimony to be inconsistent with the objective clinical findings. (Tr. 28).  The ALJ detailed the medical evidence of record, including Stone's emergency rooms visits, his cardiac and kidney problems, and his mental health treatment. (Tr. 28-31).  The ALJ also considered the treatment records of Stone's weight and BMI throughout the relevant period. (*Id.*).  With respect to his kidney issues, the ALJ noted that Stone was not following through on his three-month labs as directed, and that a renal ultrasound in April of 2021 showed generally normal blood flow characteristics.  (Tr. 28).  The ALJ further discussed his treatment for gout, including an emergency room visit in January of 2023, and noted that while he experienced some erythema and edema, as well as an antalgic gait at times, there was no significant tenderness through his foot, he had full range of motion, and had gross sensation light to touch.  (Tr. 29-30).  While Stone noted episodes of syncope and passing out, the ALJ reasoned that treatment notes indicated that he denied syncope and chest pain.  (Tr. 29).  The ALJ further discussed Stone's cardiac testing in January of 2022, which was largely unremarkable.  (*Id.*).  With respect to his mental health

15

impairments, the ALJ noted the largely unremarkable mental status examinations during the relevant time. (Tr. 31). Additionally, the ALJ found that the mental health records showed Stone's treatment was effective. (*Id.*). Ultimately, the ALJ concluded that Stone was not as limited as he alleged. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Stone was unable to perform his past work but found at Step 5 that he could perform the occupations of an office helper, marker, and routing clerk. (Tr. 34-35). Accordingly, the ALJ found that Stone had not met the stringent standard prescribed for disability benefits and denied his claim. (*Id.*).

This appeal followed. On appeal, Stone argues that the ALJ's RFC limitations and his consideration of Stone's subjective symptoms is not supported by substantial evidence. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed

17

factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*,

18

No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but

rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

**B.** **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits

under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments,

including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting*

22

*Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion

supports a disability finding or when an ALJ relies upon other evidence
to fashion an RFC, courts have routinely sustained the ALJ's exercise of
independent judgment based upon all the facts and evidence. *See
Titterington,* 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15.
Ultimately, it is our task to determine, considering the entire record,
whether the RFC determination is supported by substantial evidence.
*Burns,* 312 F.3d 113

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in August of 2021 after
Social Security Regulations regarding the consideration of medical
opinion evidence were amended.  Prior to March of 2017, the regulations
established a hierarchy of medical opinions, deeming treating sources to
be the gold standard.  However, in March of 2017, the regulations
governing the treatment of medical opinions were amended.  Under the
amended regulations, ALJs are to consider several factors to determine
the persuasiveness of a medical opinion: supportability, consistency,
relationship with the claimant, specialization, and other factors tending
to support or contradict a medical opinion.  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022).  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."  *Mason*, 994 F.2d at 1066.  Further, the ALJ can credit parts of an opinion

25

without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

### D. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations. *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir. 2009). Our review of those determinations is deferential. *Id.* However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted). An ALJ should give great weight to a claimant's testimony "only when it is supported by competent medical evidence." *McKean v. Colvin*, 150 F.

Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted).  As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms.  20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p.  Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms considering the entire administrative record.  SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p.  During the

27

second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated considering the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's symptoms and how they affect his or her ability to work. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and

effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

**E.** <u>**The ALJ's Decision is Supported by Substantial Evidence.**</u>

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Stone first argues that the ALJ erred in crafting Stone's RFC in two ways—the ALJ failed to adopt a limitation to one-to-two-step tasks, and the ALJ failed to adequately consider Stone's obesity. Regarding this mental health limitation, Stone contends that because the ALJ found Dr. Gavazzi's opinion persuasive, the ALJ should have limited Stone to one-to-two-step tasks, and the omission of this limitation requires a remand. But this argument fails to consider that the ALJ also found Dr. Fink's

opinion, which limited Stone to simple and routine tasks, persuasive. The ALJ ultimately limited Stone to simple, routine, repetitive tasks.

While the ALJ found Dr. Gavazzi's opinion persuasive, he was not required to adopt every limitation set forth in this opinion. *See Wilkinson v. Comm'r of Soc. Sec.*, 558 F. App'x 254, 256 (3d Cir. 2014). This is particularly so where the ALJ found more than one opinion persuasive. It is well settled that when an ALJ is faced with several, varying medical opinions, the ALJ may "formulate an RFC based on different parts from the different medical opinions." *Mercado v. Kijakazi*, 629 F. Supp. 3d 260, 281 (M.D. Pa. 2022) (citation omitted). Here, the ALJ limited Stone to simple, routine, repetitive tasks, which was a limitation set forth in Dr. Fink's opinion that the ALJ found persuasive. Accordingly, this is not a case in which it is difficult to trace the ALJ's reasoning, or in which the ALJ omitted a limitation from the only opinion he found persuasive. Rather, the ALJ found two opinions persuasive, finding that they were fairly consistent with one another, and adopted a specific limitation set forth in one of those opinions. We find no error with the ALJ's consideration of this medical opinion evidence.

We similarly conclude that the ALJ adequately considered Stone's obesity.    Under the agency's regulations, the ALJ must analyze the effects of a claimant's obesity on his or her ability to function.  *See* SSR 02-01p, SSR 00-3p.  This is particularly so when the ALJ identifies the claimant's obesity as a severe impairment at Step 2.  *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009).  The Third Circuit has explained that the ALJ need not "use particular language or adhere to a particular format in conducting his analysis" of a claimant's obesity.  *Diaz,* 577 F.3d at 504 (citations omitted).  Rather, so long as the ALJ "meaningfully consider[s] the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step[,]" *id.* at 504, a remand is not required.  *See Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 765 (3d Cir. 2016); *Cooper v. Comm'r of Soc. Sec.*, 563 F. App'x 904, 911 (3d Cir. 2014).

Here, the ALJ found Stone's obesity to be a severe impairment and discussed this impairment at Step 3, finding that there was no indication from the medical records that Stone's obesity exacerbated his

impairments such that it met or medically equaled a listing. (Tr. 20). Further, the ALJ recounted the medical records that documented Stone's obesity in his discussion of the medical evidence, noting that during the relevant period Stone stood about five feet seven inches tall and ranged between 236 and 255 pounds. (Tr. 28-30). This evidence was discussed in conjunction with the claimant's physical examination findings, both normal and abnormal during the relevant period. (*Id.*). Ultimately, the ALJ limited Stone to a range of light work with a sit/stand option and additional postural limitations. (Tr. 24). Thus, given that the ALJ need not use particular language or format, and instead must meaningfully consider a claimant's obesity at all steps in the sequential analysis, we find that the ALJ adequately considered Stone's obesity when crafting the RFC determination. As such, a remand is not required.

Stone also contends that the ALJ erred in assessing his subjective testimony, in that the ALJ failed to consider evidence of Stone's hospitalizations and improperly considered evidence of Stone's improvements with mental health treatment. First, we note that the plaintiff mischaracterizes the ALJ's consideration of the hospitalization

evidence, as it is clear from the decision that the ALJ explicitly considered this evidence. (Tr. 28 (discussing the April 2021 hospitalization), 30 (discussing the January 2023 emergency room visit)). The ALJ then went on to discuss that Stone had no recent frequent or repeated emergency room visits or hospitalizations for his impairments. (Tr. 28, 34). Accordingly, while the plaintiff would have us reweigh this evidence in order to reach a different conclusion than the ALJ, we are simply not permitted to do so. *Chandler*, 667 F.3d at 359.

We reach a similar conclusion with respect to the ALJ's consideration of Stone's improvements with mental health treatment. The plaintiff contends that the ALJ improperly concluded that Stone's mental health impairments improved with treatment, arguing that the ALJ's reliance on the mental status findings does not adequately reflect Stone's ability to function with respect to these impairments. At the outset, we note that the plaintiff's argument on this score is vague, simply asserting that these mental status findings do not necessarily indicate that Stone can function outside of the clinical treatment setting. Stone does not, however, argue that any particular evidence in the record shows

he is more limited than the ALJ found.  Further, the evidence the ALJ relied upon did not just consist of the clinical examination findings, but also of Stone's reports at his behavioral health visits that his mental health was improving with treatment.  Accordingly, given that we are not permitted to substitute our judgment for the ALJ's credibility findings, we conclude that substantial evidence supported the ALJ's determination that Stone was not as limited as he alleged.

Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the evidence, we find no error with the decision. Therefore, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

34

IV.    <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 27th day of May 2025.


*<u>s/ Daryl F. Bloom</u>*
Daryl F. Bloom
Chief United States Magistrate Judge

35